**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LEHMAN BROTHERS HOLDINGS INC., *et al.*,<br><br>        Debtors. | Chapter 11<br><br>Case No. 08-13555 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>                Plaintiff,<br>    - against -<br><br>1ST ADVANTAGE MORTGAGE, LLC *et al.*,<br><br>        Defendants. | Adversary Proceeding<br><br>No. 16-01019 (SCC) |
| LEHMAN BROTHERS HOLDINGS INC.,<br><br>                Plaintiff,<br>    - against -<br><br>SUBURBAN MORTGAGE, INC.,<br><br>        Defendant. | Adversary Proceeding<br><br>No. 18-01825 (SCC) |

**MEMORANDUM DECISION AND ORDER**
**DENYING MOTION TO DISMISS RMBS COMPLAINT**
**PURSUANT TO RULE 12(b)(1) FOR LACK OF**
**SUBJECT MATTER JURISDICTION AND STANDING**

A P P E A R A N C E S :

WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
By:    William A. Maher, Esq.
       James N. Lawlor, Esq.
       Adam M. Bialek, Esq.
       Brant D. Kuehn, Esq.

*Counsel for Lehman Brothers Holdings Inc.*

LANI ADLER PARTNERS LLC
275 West 96th Street
Suite 15G
New York, New York 10025
By:   Lani Aloha Adler, Esq.

*Counsel for Suburban Mortgage, Inc.*

**SHELLEY C. CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is Certain Defendants' Omnibus Motion to Dismiss RMBS Complaints

Pursuant to Rule 12(b)(1) for Lack of Subject Matter Jurisdiction and Standing [Dkt. No. 915]

and Memorandum of Law in Support thereof [Dkt. No. 915-14] (together, the "Motion").  At the

time the Motion was filed over three years ago, it was filed on behalf of a collective group of

twenty-two defendants in individual adversary proceedings each commenced by Lehman

Brothers Holdings Inc. ("LBHI" or the "Plan Administrator"), which adversary proceedings

(together with over two hundred other adversary proceedings) have been coordinated for

administrative purposes under a central adversary proceeding docket, *Lehman Bros. Holdings*

*Inc. v. 1st Adv. Mortg., LLC*, Adv. Pro. No. 16-01019.[1]  Since the filing of the Motion, twenty-

one of the moving defendants have entered into stipulations of dismissal with LBHI;[2] and the

adversary proceedings against them have been closed.  Suburban Mortgage, Inc. ("SMI") is the

sole movant continuing to prosecute the Motion.[3]

---

[1]        All references to docket numbers herein refer to filings in Adv. Pro. No. 16-01019, unless otherwise noted.
[2]        On July 18, 2014, this Court entered its Alternative Dispute Resolution Procedures Order for
Indemnification Claims of the Debtors Against Mortgage Loan Sellers (the "ADR Order"), which order has since
been amended several times.  Pursuant to the ADR Order, LBHI has engaged in mediation with loan originators and
brokers (including, but not limited to, 21 of the 22 original parties who filed the Motion) in order to resolve
thousands of contractual indemnification claims relating to allegedly defective residential mortgage loans.  *See* Adv.
Pro. No. 16-01295, Dkt. No. 72 at 1-2.
[3]        In connection with the filing of the Motion, the moving defendants, including SMI, filed (i) the Declaration
of Lani Adler [Dkt. No. 915-1] (the "Adler Decl.") and (ii) the Declaration of Tracy L. Henderson [Dkt. No. 915-9]

On July 24, 2019, LBHI filed its opposition to the Motion [Dkt. No. 1236] (the

"Opposition"), together with (a) the Declaration of Adam M. Bialek [Dkt. No. 1236-1] (the

"Bialek Decl."), (b) the Declaration of Jack E. Desens [Dkt. No. 1236-6] (the "Desens Decl."),

(c) the Declaration of Scot Osborne [Dkt. No. 1236-8] (the "Osborne Decl."), and (d) the

Declaration of Zachary Trumpp [Dkt. No. 1236-13] (the "Trumpp Decl.").

On September 18, 2019, SMI and certain moving defendants filed a reply to the

Opposition [Dkt. No. 1259] (the "SMI Reply"), together with the Declaration of Lani Adler [Dkt.

No. 1260] and the reply affidavit of Vernon Rupp, Chief Financial Officer of SMI [Dkt. No.

1261] ("Rupp Affidavit"). The Court heard oral argument on the Motion on October 16, 2019.[4]

## BACKGROUND

The Court assumes familiarity with the general background and history of the LBHI

chapter 11 cases; this Decision will provide limited background facts pertinent to the Motion.

Prior to its bankruptcy, LBHI, directly or through its affiliates, including Lehman

Brothers Bank, FSB ("LBB"), engaged in the purchase and sale of mortgage loans.  LBHI

arranged directly or through affiliates such as LBB to purchase mortgage loans from loan

originators, brokers, and other third parties (collectively, the "Sellers"); LBHI then packaged

---

(the "Henderson Decl.") in support thereof.  By the Motion, SMI seeks dismissal of the complaint filed against SMI by LBHI in Adv. Pro. No. 18-01825 (the "RMBS Complaint"), a copy of which is annexed to the Adler Decl. as Ex A.  LBHI also has a separate, pending action against SMI seeking indemnification from SMI on account of LBHI's liability to the GSEs (as defined herein) with respect to mortgage loans SMI sold to LBB (as defined herein), which loans are not at issue here.  (*See, generally*, Adv. Pro. No. 16-01295.)

[4]    On October 15, 2019, prior to oral argument on the Motion, LBHI filed a letter "to apprise the Court of the numerous procedural irregularities in the Moving Defendants' various submissions on [the Motion] . . . which are violations of the Amended Case Management Order, dated March 13, 2019 and the proper rules of procedure."  *See* Letter from William A. Maher to the Honorable Shelley C. Chapman [Dkt. No. 1277].  Among other things, such letter stated that the Rupp Affidavit purports to provide "analysis" of a series of mortgage securitization documents and other materials produced in discovery, notwithstanding that Mr. Rupp is not a witness to the events he purports to describe.  As such, LBHI contended that the Rupp Affidavit is improper as it is tantamount to "expert testimony" being offered by a non-expert who is also the officer of a party.  At the hearing held on October 16, 2019, after hearing argument from counsel to LBHI and counsel to SMI, the Court ruled that it would strike the Rupp Affidavit from the record.  *See* Oct. 16, 2019 Hr'g. Tr. [Dkt. No. 1284] at 16-19.

such loans for securitization or sale to other third parties.  One loan originator Seller from whom LBB purchased mortgage loans was SMI.

To effectuate the sale of the residential mortgage loans, each Seller entered into substantially identical Loan Purchase Agreements ("LPAs") or broker agreements ("Broker Agreements") with LBB, which agreements set forth the duties and obligations of the parties with respect to the purchase and sale of the relevant mortgage loans, including but not limited to purchase price, delivery, and conveyance of the mortgage loans and mortgage loan documents.  Such agreements also set forth the Seller's duties and obligations regarding underwriting; representations and warranties concerning the parties and individual mortgage loans purchased, sold, or submitted; and the Seller's indemnification obligations.  Pursuant to these agreements, among other things, SMI and the other Sellers contractually agreed to indemnify LBB and hold it harmless from liabilities or losses it might incur (including liabilities to third parties) as a result of breaches of the representations and warranties in the LPAs and Broker Agreements.[5]  By the RMBS Complaint, LBHI alleges that, pursuant to such agreements, SMI sold and/or submitted defective loans to LBB that resulted in LBHI being exposed to and incurring liability, for which LBHI now seeks indemnification from SMI.[6]

As described *supra*, after LBHI acquired mortgage loans, it then sold such loans or packaged them for securitization.  When it sold the loans, LBHI typically either sold them to Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation (together, the "GSEs").  When LBHI securitized the loans, the loans packaged for securitization by LBHI were transferred through a depositor to securitized trusts (the "RMBS Trusts").  In connection with both the sale and the securitization of loans, LBHI relied on information that the

---

[5]       *See* RMBS Complaint ¶¶ 28, 32.
[6]       *See* RMBS Complaint ¶ 17.

Sellers had provided to LBB, and it made representations and warranties to the GSEs and to the

RMBS Trusts based, in large part, on the representations the Sellers made to LBB.

On September 15, 2008 (the "Petition Date"), LBHI and certain of its subsidiaries and

affiliates (collectively, the "Debtors") filed voluntary chapter 11 cases in this Court.

In 2009, the trustees of hundreds of RMBS Trusts (collectively, the "RMBS Trustees")

filed claims to recover for losses in the RMBS Trusts securitized by LBHI (collectively, the

"RMBS Trustee Claims").  By such claims, the RMBS Trustees asserted breaches of

representations, warranties, and/or covenants in the agreements governing the securitizations,

which provided that the applicable RMBS Trustees may seek contractually defined repurchases

of loans in the event certain breaches of representations and warranties occurred.

LBHI objected to, and vigorously contested, the RMBS Trustee Claims.  LBHI

eventually entered into a settlement agreement with the RMBS Trustees, pursuant to which it

agreed to seek estimation of the liability underlying their claims in a proceeding before this

Court (the "Estimation Proceeding").  *See In re Lehman Bros. Holdings, Inc.*, 566 B.R. 353, 356-

57 (S.D.N.Y. 2017).  In the Estimation Proceeding, the RMBS Trustees sought damages of over

$11.4 billion based upon losses flowing from, among other things, the mortgage loans acquired

from the Sellers and securitized by LBHI.  After a lengthy trial, on March 15, 2018, this Court

entered the Order Estimating Allowed Claims Pursuant to RMBS Settlement (the "Estimation

Order"),[7] which resulted in allowed claims for the RMBS Trustees of more than $2.37 billion.

Entry of the Estimation Order gave rise to third-party indemnification claims (the "RMBS

Indemnification Claims") that LBHI has asserted against, among other Sellers, SMI, for LBHI's

---

[7]     On March 8, 2018, this Court rendered its Bench Decision Regarding Estimation of RMBS Claims
Pursuant to RMBS Settlement Agreement [Case No. 08-13555, Dkt. No. 57791] (the "RMBS Decision"), a
transcript of which is also annexed to the Estimation Order.  The Estimation Order was entered on March 15, 2018
[Case No. 08-13555, Dkt. No. 57785] and is attached as Ex. D to the Bialek Declaration.

incurred losses, liability, and/or judgment to the RMBS Trustees.[8]  The Estimation Order

provides that "[t]his Court shall retain jurisdiction with respect to all matters arising from or

related to the implementation of this Order."  (*Id.* at ¶ 5.)

On December 6, 2011, this Court confirmed the Modified Third Amended Joint Chapter

11 Plan of LBHI and Its Affiliated Debtors (the "Plan").[9]  (*See* Order Confirming Plan [Case No.

08-13555, Dkt. No. 23023] (the "Confirmation Order").[10])

## I.    The Parties' Arguments

By the Motion, SMI moves, pursuant to Federal Rule of Civil Procedure 12(b)(1) ("Rule

12(b)(1)"), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012,

to dismiss the RMBS Complaint for lack of subject matter jurisdiction and lack of standing on

the grounds that LBHI allegedly did not possess prepetition indemnification claims against SMI

or the right to sue on such claims when LBHI filed the RMBS Complaint.  SMI argues that the

RMBS Indemnification Claims were never property of the LBHI bankruptcy estate because such

claims were not held by LBHI prepetition; accordingly, SMI asserts that the Court does not have

subject matter jurisdiction over the RMBS Indemnification Claims, and those claims must be

dismissed.  SMI reincorporates by reference the arguments made in the *Motion to Dismiss for

Lack of Subject Matter Jurisdiction and Improper Venue* [Dkt. No. 413] (the "GSE Motion to

Dismiss"), which motion was previously denied by this Court.[11]  In the alternative, SMI submits

---

[8]      After entry of the Estimation Order, LBHI filed over one hundred complaints in this Court against
individual Sellers from whom LBHI sought indemnification on account of RMBS Indemnification Claims.  As
stated previously, all of these adversary proceedings have been coordinated for administrative purposes under the
central docket of Adv. Pro. No. 16-01019, and the large majority of them have them have been resolved
consensually through mediation and have now been dismissed.

[9]      The Plan is attached to the Bialek Declaration as Ex. B.

[10]      The Confirmation Order is attached to the Bialek Declaration as Ex. A.

[11]      *See In re Lehman Bros. Holdings Inc.*, 2018 WL 3869606, 2018 Bankr. LEXIS 2406 (Bankr. S.D.N.Y.
Aug. 13, 2018), *leave to appeal denied*, 2019 WL 2023723 (S.D.N.Y. May 8, 2019) (the "GSE Subject Matter
Jurisdiction Decision").  The GSE Motion to Dismiss was filed on March 31, 2017 by a collective group of over
seventy individual defendant Sellers in adversary proceedings commenced by LBHI seeking indemnification from

that because, prior to the Petition Date, LBHI purportedly was divested of any rights and

remedies it had with respect to the loans at issue in the RMBS Complaint, LBHI does not have

standing to bring the RMBS Complaint.

LBHI vehemently argues that the Motion should be denied because subject matter

jurisdiction is proper in this Court and because the Plan Administrator has standing to bring the

RMBS Indemnification Claims.  Specifically, LBHI asserts that the Plan Administrator obtained

contingent, unmatured indemnification rights against SMI prior to the Petition Date, which rights

ripened into the RMBS Indemnification Claims following this Court's entry of the Estimation

Order allowing the RMBS Trustee Claims, giving the Court subject matter jurisdiction over the

RMBS Indemnification Claims.[12]  As to standing, LBHI asserts that, with respect to the loans at

issue, LBHI retained indemnification rights for such loans when it packaged them for

securitization, and SMI mischaracterizes or simply misunderstands the relevant securitization

documents.  LBHI submits that the Motion must be denied whether it is treated by this Court as a

facial motion or as a fact-based motion under Rule 12(b)(1).

---

such Sellers for LBHI's liability to the GSEs as subsequent purchasers of loans which were later found to contain
various defects that violated the representations, warranties, and/or covenants under the purchase agreements for
such loans.  Similar to the RMBS Complaint, by the complaints filed against such Sellers (collectively, the "GSE
Actions"), LBHI asserted that, by selling defective loans to LBB, each defendant Seller breached its obligations
under the applicable loan purchase agreements.  Accordingly, by the GSE Actions, LBHI asserted a third-party
indemnification claim against each Seller defendant for LBHI's liability to the GSEs (collectively, the "GSE
Indemnification Claims").  The GSE Motion to Dismiss contended, among other things, that this Court lacked
subject matter jurisdiction over the GSE Indemnification Claims asserted in the GSE Actions.  By the GSE Subject
Matter Jurisdiction Decision, this Court denied the GSE Motion to Dismiss and found that this Court has subject
matter jurisdiction over the GSE Indemnification Claims asserted against the Seller defendants in the GSE Actions.
[12]      The Plan Administrator also repeats and incorporates by reference the arguments made in the
Memorandum of Law of Plaintiff LBHI in Opposition to Certain Defendants' Omnibus Motion to Dismiss for Lack
of Subject Matter Jurisdiction and Improper Venue [Dkt. No. 445], which was filed in response to the GSE Motion
to Dismiss.

**DISCUSSION**

## I.   **Applicable Law**

Rule 12(b)(1), made applicable to this proceeding by Federal Rule of Bankruptcy

Procedure 7012, requires that an action be dismissed for lack of subject matter jurisdiction when

the district court lacks the statutory or constitutional power to adjudicate the case.  *Morrison v.*

*Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), *aff'd*, 130 S. Ct. 2869 (2010) (quoting

*Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)) ("'Determining the existence of subject

matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject

matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or

constitutional power to adjudicate it.'").

"The Second Circuit has distinguished between two types of Rule 12(b)(1) motions: (i)

facial motions and (ii) fact-based motions."  *Matter of Trusts Established under the Pooling and*

*Servicing Agreements relating to the Wachovia Bank Commercial Mortg. Trust Commercial*

*Mort. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 446-47 (S.D.N.Y.

2019) (citing *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56-57 (2d Cir. 2016)).  "When the

Rule 12(b)(1) motion is facial, i.e., based solely on the allegations of the complaint or the

complaint and exhibits attached to it (collectively, the 'Pleading'), the plaintiff has no

evidentiary burden.  The task of the . . . court is to determine whether the Pleading 'allege[s]

facts that affirmatively and plausibly suggest that the [plaintiff] has standing to sue.'" *Carter*,

822 F.3d at 56 (citations omitted).

"In resolving a [facial] motion to dismiss under Rule 12(b)(1), district court[s] must take

all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor

of the party asserting jurisdiction."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752

F.3d 239, 243 (2d Cir. 2014); *see also Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140,

145 (2d Cir. 2011) ("In reviewing a facial attack to the court's jurisdiction, [courts] draw all facts

– which [are] assume[d] to be true unless contradicted by more specific allegations or

documentary evidence – from the complaint and from the exhibits attached thereto.").  However,

"[w]here jurisdictional facts are placed in dispute, the court has the power and obligation to

decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon*,

752 F.3d at 243 (citations omitted). "In that case, the party asserting subject matter jurisdiction

'has the burden of proving by a preponderance of the evidence that it exists.'" *Id.* (citation

omitted).

      "Alternatively, a defendant is permitted to make a fact-based Rule 12(b)(1) motion,

proffering evidence beyond the complaint and its exhibits." *Matter of Trusts*, 375 F. Supp. 3d at

446-47 (quoting *Carter*, 822 F.3d at 57). "In opposition to such a motion, [a plaintiff] must

'come forward with evidence of their own to controvert that presented by the defendant,' or may

instead 'rely on the allegations in the[ir p]leading if the evidence proffered by the defendant is

immaterial because it does not contradict plausible allegations that are themselves sufficient to

show standing.'" *Id.* (quoting *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir.

2017)).

## II.    Subject Matter Jurisdiction

      By the Motion, SMI asserts that the RMBS Complaint is facially defective because LBHI

fails to allege facts which meet its burden to demonstrate that it was assigned the RMBS

Indemnification Claims by LBB prior to the Petition Date.  SMI also raises a factual challenge

pursuant to Rule 12(b)(1), arguing that the relevant agreements, which reflect what claims and

rights LBHI could have owned and when with respect to the loans at issue, demonstrate that

subject matter jurisdiction and standing are lacking.  (Motion at 15.)  The Court will begin by

addressing subject matter jurisdiction.

Contrary to SMI's contentions, LBHI argues that it obtained from LBB contingent,

unmatured rights against SMI prior to LBHI's bankruptcy filing, which rights ripened and

matured into the RMBS Indemnification Claims following entry of the Estimation Order

allowing the RMBS Trustee Claims.  As such, LBHI submits that, as this Court found in the GSE

Subject Matter Jurisdiction Decision and for the reasons set forth therein, the Court should

adhere to its prior ruling and find that it has subject matter jurisdiction over the RMBS

Indemnification Claims asserted by the RMBS Complaint.

In order to address SMI's argument that the RMBS Complaint is facially defective under

Rule 12(b)(1), the Court begins by assuming the facts set forth in the complaint are true, and it

will subsequently address whether the evidence proffered by SMI is sufficient to contradict

LBHI's allegations therein such that the Court must go beyond the pleadings and resolve any

disputed issues of fact necessary to a ruling on the Motion.  *See Amidax Trading Grp.*, 671 F.3d

at 145 ("In reviewing a facial attack to the court's jurisdiction, [courts] draw all facts – which

[are] assume[d] to be true unless contradicted by more specific allegations or documentary

evidence – from the complaint and from the exhibits attached thereto."); *see also APWU v.

Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (citing *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d

Cir. 1999)) ("[W]here jurisdictional facts are placed in dispute, the court has the power and

obligation to decide issues of fact by reference to evidence outside the pleadings, such as

affidavits.").

An understanding of the agreements relevant to the sales by LBB to LBHI of the loans at

issue and the timing of such sales is integral to the Court's ruling on subject matter jurisdiction.

As such, what follows is a detailed discussion of (i) the facts and allegations set forth in the

RMBS Complaint regarding the transfer of indemnification rights from LBB to LBHI, which the

Court assumes to be true and, as discussed *infra*, finds to be sufficiently and plausibly pled, and

(ii) SMI's arguments against a finding of subject matter jurisdiction, each of which, for the

reasons set forth *infra*, do not withstand scrutiny.

### A. The Plan Administrator Sufficiently and Plausibly Alleges That LBHI Obtained Prepetition its Rights Against SMI

#### 1. The Agreements Expressly Extended SMI's Indemnification Obligations to LBHI

As described *supra*, prior to its bankruptcy, LBHI, directly or through its affiliates,

including LBB, engaged in the purchase and sale of mortgage loans.  LBHI arranged directly or

through affiliates such as LBB to purchase mortgage loans from the Sellers; once LBHI acquired

such mortgage loans, it either sold them or packaged them for securitization.  One loan originator

Seller from whom LBB purchased mortgage loans was SMI.

To effectuate the sale of their residential mortgage loans, the Sellers entered into

substantially identical LPAs and/or Broker Agreements with LBB."[13]  Each LPA expressly

incorporates the terms of a separate Seller's Guide (the "Seller's Guide,"[14] and, collectively with

the LPAs and the Broker Agreements, the "Agreements").  Pursuant to the Agreements, among

other things, SMI and the other Sellers contractually agreed to indemnify LBB and hold it

harmless from liabilities or losses it might incur (including liabilities to third parties) as a result

of breaches of the representations and warranties in the Agreements.[15]

---

[13]    The LPA between LBB and SMI is dated December 3, 2004, and the Broker Agreement is dated October 1, 2004.  Copies of these agreements are attached to the Osborne Decl. (*See* Osborne Decl. Ex. A (LPA), Ex. B (Broker Agr.).)

[14]    The Seller's Guide is attached to the Osborne Decl. as Ex. C.

[15]    *See* RMBS Complaint ¶¶ 28, 32.

After LBB purchased the relevant mortgage loans from SMI and the other Sellers, it sold the loans to LBHI, who then packaged them for securitization.[16]  The RMBS Complaint alleges that, in conjunction with the sale by LBB to LBHI of such loans, LBB assigned to LBHI all of its rights and remedies under the Agreements pertaining to the loans.[17]

LBHI submits that "the Agreements between loan originators and LBB expressly allowed LBB to assign its rights under the Agreements, and otherwise automatically extended or transferred those rights to affiliates and subsequent purchasers of the [mortgage loans], thereby facilitating LBB's sale of loans to LBHI."  (Opposition at 4-5.)  By the RMBS Complaint, LBHI alleges that, pursuant to the Agreements, the parties agreed that the rights of LBB, including contractual rights to indemnification, and the obligations of SMI as Seller would extend to any subsequent purchaser and/or assignee of the loans at issue.[18]  In support of such allegations, LBHI cites to the following subsequent holder/third party beneficiary provisions of the Agreements, each of which expressly extends to LBHI SMI's obligations as Seller under the Agreements via four independent bases: (i) LBHI is an assignee of LBB; (ii) LBHI is a subsequent holder of the loans at issue; (iii) LBHI is a third-party beneficiary of the LPA and the Seller's Guide; and (iv) LBHI is a Purchaser itself.  SMI has not submitted any evidence to contradict this documentary evidence, and, as such, the Court must take the allegations of LBHI, the plaintiff, as true.  In any event, even if the Court were required to consider the Agreements themselves, the Court finds the provisions cited by LBHI to be unambiguous regarding the extension of rights and obligations to LBHI.  The key provisions of the Agreements are as follows:

---

[16]    *See* RMBS Complaint ¶ 34.
[17]    *See* RMBS Complaint ¶ 20.
[18]    *See* RMBS Complaint ¶ 18.

### a)    Seller's Guide

LBHI contends that the LPA and the incorporated Seller's Guide expressly permit LBB to assign all of its rights, including rights to contractual indemnification, and that the parties agreed that SMI's obligations would extend to any subsequent purchasers and/or assignees, such as LBHI.  First, with respect to each "particular Mortgage Loan," the Seller's Guide defines the "Purchaser" as LBB and, among others, its "successors and/or assigns." (Osborne Decl., Ex. C (Seller's Guide) § 800 (definition of "Purchaser").)  LBHI alleges that, as an assignee of LBB, LBHI was a "Purchaser" who acquired the RMBS Indemnification Claims from LBB at the time it purchased the loans at issue from LBB prepetition.  Pursuant to Section 711 of the Seller's Guide, SMI agreed to indemnify the "Purchaser" and "Purchaser's designee" including any "subsequent holder of any Note" from any claims or losses sustained as a result of any breach of SMI's representations and warranties:

> 711. Indemnification and Third Party Claims
>
> In addition to any repurchase and cure obligations of Seller . . . Seller shall indemnify Purchaser and Purchaser's designee (including, without limitation, *any subsequent holder of any Note*) from and hold them harmless against all claims, losses, damages, penalties, fines, claims, forfeitures, lawsuits, court costs, reasonable attorney's fees, judgments and any other costs, fees and expenses that the Purchaser may sustain in any way related to or resulting from any act or failure to act or any breach of any warranty, obligation, representation or covenant contained in or made pursuant to this Seller's Guide or the Loan Purchase Agreement by any agent, employee, representative or officer of Seller or Seller's correspondent.

(*Id*. at § 711 (emphasis added).)  LBHI thus acquired the RMBS Indemnification Claims as both a "Purchaser" and as a "subsequent holder of any Note."  Section 713.3 of the Seller's Guide further provides that Purchaser shall have the right to assign its rights and duties under the LPA and the Seller's Guide, stating as follows:

> Purchaser shall have the right to assign its rights and duties under the Loan Purchase Agreement and this Seller's Guide to any party without the consent of Seller. . . . Purchaser also may assign separately to any other party any or all representations, warranties or covenants made by Seller to Purchaser in the Seller's Guide or Loan Purchase Agreement, along with any or all of Purchaser's remedies available against the Seller for Seller's breach of any representation, warranty or covenant hereunder, including, without limitation, the repurchase and indemnification remedies.

(*Id.* at § 713.3; *see also* Osborne Decl., Ex. A (LPA) § 4 (providing the LPA "shall bind and inure to the benefit of and be enforceable by the Seller and LBB and their respective successor and assigns").)  Finally, the Seller's Guide provides that "any subsequent holder of any Note acquired hereunder by Purchaser shall be a third-party beneficiary of the Loan Purchase Agreement and this Seller's Guide."  (RMBS Complaint ¶ 21 (citing Seller's Guide § 711).)

### b)    Broker Agreement

LBHI further submits that the Broker Agreement that SMI executed with LBB permits assignment and expressly provides that the indemnification obligations of SMI set forth therein extend to LBB's affiliates, which include LBHI.  Specifically, the Broker Agreement provides that LBB as the "Lender, in its sole discretion, may assign this Agreement from time to time." (RMBS Complaint ¶ 19 (citing Broker Agreement § 19).)  The Broker Agreement states that "Broker shall indemnify and hold Lender, its successors and assigns, and their respective officers, directors, employees, shareholders, members, agents, contractors, affiliates and subsidiaries . . . harmless from and against . . . (i) any breach of any representation or warranty made by Broker pursuant to this Agreement or [Seller's Guide]."  (Osborne Decl., Ex. B (Broker Agr.) § 9.)

**2. SMI Fails to Contradict with Specific, Cogent Allegations or Documentary Evidence LBHI's Allegations That the Agreements Expressly Extended SMI's Indemnification Obligations to LBHI**

By its Reply, SMI asserts a number of different interpretations of the foregoing contractual provisions of the Seller's Guide and Broker Agreement, each which SMI argues supports its argument that LBB did not transfer to LBHI prepetition the right to assert the RMBS Indemnification Claims.  SMI's assertions include, *inter alia*, that: (i) LBHI has not shown it was a noteholder because it may never have held the notes for the loans that were transferred to the RMBS Trusts on the same date (Reply at 13, 18); (ii) LBHI has not shown that it was a "Purchaser" under the Seller's Guide because, if LBHI's definitional argument as to "successors and/or assigns" were accepted, all subsequent noteholders and owners of a particular mortgage loan could then be considered "Purchasers," which would mean that the settlement payment by LBHI to the RMBS Trustees was made by one Purchaser to another Purchaser; and the resulting indemnification claims would instead be claims between parties to the same agreement for breach (Reply at 19); (iii) Section 713.3 of the Seller's Guide specifies that representations and warranties can be assigned "separately" at a different time; as such, LBHI's "assumption" that the Seller's Guide provides that whenever LBB sold a loan, it would simultaneously transfer its rights as part of the sale of the loan is "at odds with the plain language of Section 713.3" (Reply at 17); (iv) because, under New York law, only an intended third party beneficiary may enforce a contract, the language in Section 711 of the Seller's Guide providing that a subsequent holder shall be a third party beneficiary of the LPAs is ineffective to cause LBHI to become an intended third party beneficiary because third party beneficiary status is conferred only once the assignment has occurred (Motion at 23); and (v) the language of the Broker Agreement, which provides that "[b]roker shall indemnify and hold [LBB], its successors and assigns, and their respective . . . affiliates," should be interpreted to mean that only an affiliate of an assignee could

15

conceivably have been indemnified, such that LBHI could not have become an assignee of indemnification rights prepetition.  (*See* Reply at 1 n.1.)

SMI has proffered no evidence in opposition to LBHI's well-pleaded allegations that at the time LBB sold the relevant mortgage loans to LBHI prior to the Petition Date, (i) pursuant to the Agreements (a) LBHI became a Purchaser (as defined in the "Seller's Guide"); (b) LBHI is a subsequent holder of the mortgage loans at issue; (c) LBHI is a third party beneficiary of the LPA (and the incorporated Seller's Guide); and (d) LBHI is an assignee of LBB and (ii) as such, SMI is required to indemnify LBHI for, among other things, any liabilities, losses, and judgments to the RMBS Trustees arising out of SMI's breaches of its representations and warranties in the Agreements.  As SMI has submitted neither cogent allegations to contradict LBHI's assertions nor documentary evidence proving otherwise, the Court accepts as true LBHI's well-pleaded allegations regarding the transfer of LBB's rights under the Agreements to LBHI.  Accordingly, with respect to SMI's facial motion under Rule 12(b)(1), LBHI has no additional evidentiary burden to meet in opposing the Motion.  *See Matter of* Trusts, 375 F. Supp. at 447 (holding that, to resolve a facial Rule 12(b)(1) motion, a court must determine whether the complaint and its exhibits allege facts that establish subject matter jurisdiction and, to make that determination, a court must accept as true the complaint's allegations and draw all reasonable inferences in favor of the plaintiff).

Even assuming, *arguendo*, that the Court did not find that LBHI's well-pleaded allegations alone cause SMI's contractual interpretation arguments to fail, the Court independently finds that each of SMI's assertions with respect to the Seller's Guide and the Broker Agreements do not withstand scrutiny.  First, with respect to the Broker Agreement, which provides that "[b]roker shall indemnify and hold [LBB], its successors and assigns, and

their respective . . . affiliates," a natural reading of this provision is that "their" refers to "[LBB],

its successors, and assigns;" it is nonsensical to read such provision to state, as SMI argues, that

affiliates of assignees should benefit from the clause when affiliates of LBB would not benefit

from it.  Second, with respect to the Seller's Guide provisions, (i) as discussed more fully *infra*,

LBHI has adequately pled that it held the loans at issue, and there is no minimum duration for

LBHI to have held such loans; (ii) by selling the notes to the RMBS Trusts, LBHI did not lose its

subsequent "holding status" which included the right to retain and separately enforce

indemnification rights; a finding otherwise would render LBHI's indemnification rights

illusory;[19] and (iii) even though Section 713.3 of the Seller's Guide provides that LBB may

assign indemnification rights "separately," this language does not preclude LBB ability to

transfer indemnification rights simultaneously with the sale of mortgage loans, as LBHI alleges

occurred with respect to the loans at issue here.

Finally, SMI asserts that only a party to which LBB actually assigns rights may become

an intended third-party beneficiary of such rights.  Simply put, this is a mischaracterization of

Section 711 of the Seller's Guide.  Section 711 provides that "any subsequent holder of any Note

acquired hereunder by Purchaser shall be a third-party beneficiary of the Loan Purchase

Agreement and this Seller's Guide;" a plausible interpretation of such provision is that

subsequent holders were intended third-party beneficiaries of the indemnification obligations in

the LPAs.  *See 243-249 Holding Co., LLC v. Infante*, 771 N.Y.S. 2d 651, 652 (1st Dep't 2004)

("the best evidence of the intent to bestow a benefit upon a third party is the language of the

contract itself"); *see also Dutt v. Young Adult Inst., Inc.*, 2018 WL 3148360, at *8 (S.D.N.Y.

June 26, 2018) (citing *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 162

---

[19]     This Court has previously rejected this argument in the context of the GSE Indemnification Claims.  *See*
May 5, 2015 Hr'g Tr. [Case. No. 08-13555, Dkt. No. 49678] at 68:7-9, 66:13-15; 69:11-16; 30-31.

(S.D.N.Y. 1998), *reconsideration denied*, 2019 WL 463848 (S.D.N.Y. Feb. 6, 2019)) (providing

that third party beneficiary status can be established if either ""(1) 'no one other than the third

party can recover if the promisor breaches the contract,' or (2) 'the language of the contract

otherwise clearly evidences an intent to permit enforcement by the third party.'").

### 3. LBB Sold the Loans at Issue to LBHI Prepetition and, in Conjunction with Such Sales, LBHI Acquired All of LBB's Rights and Remedies Under the Agreements

SMI's argument that the Court does not have subject matter jurisdiction over the RMBS

Complaint is based on both the language of the Agreements and on the timing of the sale of the

at-issue loans by LBB to LBHI, as SMI asserts that the indemnification rights under the

Agreements were not held by LBHI prior to the Petition Date.  Here, SMI challenges the factual

basis of the Court's jurisdiction and asserts that LBHI is required to demonstrate by a

preponderance of the evidence facts that establish that the Court has subject matter jurisdiction.

In connection with its factual challenge to the Court's jurisdiction, SMI alleges that even

assuming, *arguendo*, the Agreements permitted assignment of rights and remedies by their terms,

as LBHI argues, the publicly filed assignment and securitization documents establish that LBHI

did not own the RMBS Indemnification Claims on the Petition Date, and, in fact, LBB did not

assign to LBHI any indemnification rights and remedies under the Agreements, "until long after

the LBHI Petition Date." (Motion at 17.)

In support of its contentions, SMI points to five written assignment agreements

(collectively, the "Assignment Agreements") between LBHI and LBB "on which LBHI

purportedly relies to claim it obtained the rights to Indemnification." (Motion at 10.)[20]  All of the

---

[20]     The Assignment Agreements are dated September 2, 2008; June 25, 2010; February 12, 2013; May 9, 2013; and May 13, 2014, and, with the exception of the May 9, 2013 agreement, they are each attached to the Adler Decl. as Exs. B through E.

Assignment Agreements were executed after the Petition Date with the exception of one, which

is dated September 2, 2008; several of the Assignment Agreements attach schedules of names of

Sellers covered by such agreement, and certain of the postpetition Assignment Agreements

reference the September 2, 2008 agreement and purport to amend the list of assignments on

Schedule A to the September 2, 2008 agreement.[21]  SMI argues that the Assignment Agreements

demonstrate that LBHI "did not have any contingent, unmatured or other claims with respect to

the Moving Defendants' [sic] on or before the LBHI Petition Date," and that the lack of clarity in

the Assignment Agreements precludes any finding by the Court to the contrary.  (Motion at 20-

21.)  Accordingly, SMI submits that there is no "related to" jurisdiction pursuant to 28 U.S.C.

Section 1334(b) because there is no "close nexus" between the Plan and the RMBS

Indemnification Claims, as LBHI did not hold such claims against SMI prepetition.  Specifically,

as articulated by SMI, "[t]he Court's characterization of the GSE Indemnification Claims as

prepetition claims held by LBHI was determinative of its [GSE Subject Matter Jurisdiction

Decision] that it had 'related to' subject matter jurisdiction" over such claims, but, as the

indemnification claims at issue here were not held prepetition, the analysis and reasoning of that

decision "cannot be utilized to generate related to subject matter jurisdiction over the RMBS

Indemnification Claims."  (Motion at 19-20.)

　　　　Regarding the timing of the assignment of indemnification rights to LBHI, LBHI

vehemently argues that, as sufficiently alleged in the RMBS Complaint, LBHI obtained its rights

against SMI prepetition because (i) the Agreements expressly extended SMI's obligations to

---

[21]    SMI acknowledges that it is listed on the schedule to the February 13, 2012 Assignment Agreement and the May 13, 2014 Assignment Agreement, each which references the September 2, 2008 Assignment Agreement.  The May 13, 2014 Assignment Agreement lists all assignments subsequent to 2008 and purports to amend the attached Schedule A and "grant transfer and assign" to LBHI all "right title and interests" under certain LPAs.  (Motion at 11.)  By the Opposition, LBHI submits that SMI's reliance on certain language in these agreements is "inaccurate" and "misplaced." (Opposition at 24 n.26.)

LBHI and (ii) such rights and obligations transferred immediately upon LBHI's purchase of loans from LBB prepetition. LBHI contends that the Court is not required to go beyond the plausible allegations in the RMBS Complaint because the Assignment Agreements proffered by SMI as documentary evidence purportedly creating a factual issue regarding jurisdiction do not in fact contradict LBHI's allegations in the RMBS Complaint; as such, this evidence is immaterial. *See Carter*, 822 F. 3d at 56 ("the Plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing."). Notwithstanding, because SMI has submitted affidavits in support of the Motion in an attempt to raise a factual issue regarding jurisdiction, LBHI has come forward with evidence of its own to controvert that submitted by SMI.[22] In opposition to the Motion, LBHI filed three declarations and related business records establishing that (i) LBB sold the loans at issue to LBHI *prepetition* between August 2003 and January 2008 and (ii) at the time LBB sold the loans, it assigned the rights and remedies under the Agreements to LBHI.

Specifically, Mr. Osborne[23] and Mr. Desens[24] each testify in their declarations that SMI brokered or sold to LBB the loans at issue in the RMBS Complaint between August 2003 to January 2008, which transactions were inventoried and recorded in a whole loan tracking system

---

[22]    "In opposition to [a fact-based] motion, a plaintiff must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017).

[23]    As set forth in his declaration, Mr. Osborne was employed by Aurora Loan Services from November 2005 through January 2011, where he worked as a claims specialist dealing, in part, with mortgage originators and residential mortgage loans. From January 2011 to present, he has been employed by LBHI as a Claims Specialist and then as Vice President: Residential Claims Management.

[24]    As set forth in his declaration, Mr. Desens is a former Managing Director of LBHI, who was employed at LBHI from July 1985 through March 1989 and again from June 1991 through February 2008. From 1991 through 2008, Mr. Desens worked in LBHI's Contract Finance department, and from 2000 through 2008, he managed the department. While in the Contract Finance department, Mr. Desens' primary responsibilities included negotiating the agreements for the purchase of mortgage loans from mortgage originators and LBB.

(the "Whole Loan Tracking System").  (*See* Osborne Decl. ¶ 10; Desens Decl. ¶ 6.)  The Whole

Loan Tracking System recorded, among other things, the buyer and seller of each mortgage loan,

the date of the purchase and sale, and the price.  (Osborne Decl. ¶ 12.)[25]  After acquiring the

loans from the Sellers, LBB held the loans for a short time, after which it typically sold the loans

to LBHI at its cost.  (Osborne Decl. ¶ 8; Desens Decl. ¶ 5.)

Mr. Desens affirms in his declaration that when LBB sold a loan to LBHI between

August 2003 and January 2008, LBB assigned to LBHI all of its rights and remedies under the

Agreements, including the rights and remedies related to the loans at issue in the RMBS

Complaint.  (Desens Decl. ¶¶ 5, 8.)  However, as Mr. Desens makes clear, LBB and LBHI did

not create separate, individual assignment agreements for each mortgage loan purchased from a

Seller because it would have been too cumbersome a process given the volume and frequency of

transactions in the mortgage loan market; moreover, additional documenting of the numerous

transactions would have been duplicative and unnecessary given the sufficiency of the

combination of the LPAs, the Broker Agreements, and LBHI's internal recording of each

transaction through the Whole Loan Tracking System.  (Desens Decl. ¶ 9.)

Mr. Desens also testifies that LBHI purchased mortgage loans from LBB on an ongoing

basis under Purchase Price and Terms Letters ("PPTLs") and that "[t]he [PPTL] shows that LBB

and LBHI conveyed certain rights to LBHI, including indemnification rights, under the

Agreements, which [LBHI] could transfer or retain."  (Desens Decl. ¶ 10; *Id.*, Ex. A (PPTL).)

Although LBB alleges that it assigned its rights to LBHI at the time of the loan sale, as

affirmed by Mr. Desens, the parties did not always execute individual written assignments at the

---

[25]       An excerpted copy of the Whole Loan Tracking System is attached to the Osborne Declaration as Ex. D.

time of sale.  LBHI's third declarant, Mr. Trumpp,[26] testifies that LBB and LBHI later

memorialized certain pre-petition assignments of rights in several written agreements – the

Assignment Agreements – so that there was a clear written record of those prior assignments.

(*See* Trumpp Decl. ¶ 23.)  Mr. Trumpp states that, although the Assignment Agreements were

executed later, they were executed as a "belt and suspenders" to the prepetition assignments "for

ease of reference in connection with later collection efforts from sellers so that no such loan

seller could later contend that there was no written assignment agreement by non-debtor LBB."

(Trumpp Decl. ¶ 24.)

     SMI argues that LBHI has "effectively admit[ted]" that there are no assignment

documents which identify the assignment of remedies for each at-issue loan, and the Desens

Declaration does not provide competent evidence that LBB intended to, and did, assign the

RMBS Indemnification Claims to LBHI at the time LBB sold it the loans.  (Reply at 20.)  SMI

also casts aspersions on LBHI's apparent suggestion that the Seller's Guide demonstrates that

LBB intended to assign the indemnification remedy to LBHI, and states that the Seller's Guide

cannot constitute a transfer of property because New York law requires a "perfected transaction"

to create an assignment.  (*See* Reply at 14-15 (citing *Wells Fargo Bank, N.A. v. 390 Park Ave.

Assocs., LLC*, 2018 WL 4373996, 2018 U.S. Dist. LEXIS 156283, *7 (S.D.N.Y. Sept. 12,

2018)).)  Finally, SMI argues that the Assignment Agreements cannot legitimize any oral

prepetition assignment because retroactive assignments are not permissible under New York law.

(*See* Reply at 16-17 (citing *Wells Fargo Bank*, 2018 WL 4373996 at *7).)  Therefore, submits

---

[26]     As set forth in his declaration, Mr. Trumpp was employed by Aurora Loan Services from December 2002 through February 2009 and has been employed by LBHI since February 2009.  He is currently a Senior Vice President in Claims Management in LBHI's residential mortgage group.

SMI, LBHI has not met its burden to demonstrate that it had been assigned the RMBS

Indemnification Claims prior to the Petition Date.

LBHI responds that the Assignment Agreements do not change the analysis because the

RMBS Indemnification Claims were assign prepetition in compliance with New York law, and

SMI has not demonstrated that any "belt and suspenders" documents executed later in time serve

to eradicate earlier rights.  LBHI contends, as discussed *supra*, that in connection with the

prepetition sale of the loans at issue from LBB to LBHI, under the Agreements LBHI

contemporaneously became (a) a Purchaser (as defined in the "Seller's Guide"); (b) a subsequent

holder of the mortgage loans at issue; (c) a third party beneficiary of the LPA (and the

incorporated Seller's Guide); and (d) an assignee of LBB, each of which is expressly provided by

the Agreements.  Pursuant to the foregoing, upon the sale to LBHI of the loans at issue, all of

LBB's rights under such Agreements were extended to LBHI without any separate written

assignment.  As such, LBHI disputes SMI's characterization of the Assignment Agreements as

an attempt by LBHI to effectuate a "retroactive" assignment.

Moreover, LBHI maintains that the declarations filed by Mr. Desens, Mr. Osborne, and

Mr. Trumpp further establish the parties' intention to effectuate a contemporaneous assignment

of rights at the time LBB sold the mortgage loans to LBHI prepetition.  LBHI submits that, under

New York law, "[n]o particular words are necessary to effect an assignment; it is only required

that there be a perfected transaction between the assignor and assignee, intended by those parties

to vest in the assignee a present right in the things assigned." *Leon v. Martinez*, 84 N.Y.2d 83,

88, 614 N.Y.S.2d 972, 974 (1994) (citations omitted); *see also Miller v. Wells Fargo Bank Int'l

Corp.*, 540 F.2d 548, 557 (2d Cir. 1976) (internal quotations omitted) ("any act or words are

sufficient which show an intention of transferring" rights to the assignee); *Condren, Walker &*

*Co., Inc. v. Portnoy*, 856 N.Y.S.2d 42, 43 (1st Dep't 2008) (finding that sale of notes also assigned obligation to pay brokerage commission where existence of assignment " was confirmed by the uncontroverted actions and testimony of signatories of the original fee agreement").

Further, LBHI argues that SMI has submitted no evidence to rebut the declarations proffered by LBHI, and, as such, the testimony must be accepted as true by the Court on a motion to dismiss. Finally, LBHI asserts that SMI's argument that LBHI did not acquire prepetition the right to assert the RMBS Indemnification Claims defies commercial realities. If LBHI had purchased Sellers' mortgage loans from LBB for full value *without* acquiring the ability to enforce the representations and warranties of the Sellers, LBHI would have been left with no remedy for any losses caused by a Seller's breach of such representations and warranties, which makes little commercial sense. (Opposition at 23.)

The Court finds that LBHI has adequately alleged facts that, when it purchased from LBB between August 2003 and January 2008 the mortgage loans at issue in the RMBS Complaint, LBHI contemporaneously obtained the rights to pursue the RMBS Indemnification Claims, which rights were automatically transferred to LBHI under the Agreements in conjunction with the sale of the loans. First, as the Court has previously concluded, the Agreements expressly extended SMI's indemnification obligations to LBHI in its capacity as a subsequent holder of a note, a third-party beneficiary of the LPAs, a Purchaser (as defined in the Seller's Guide), and an assignee. SMI fails to substantiate its assertion that LBHI mischaracterizes the language of the Agreements. Further, after considering the arguments and evidence proffered by SMI on the issue of assignment (here, the Assignment Agreements), the Court finds that the testimony of the LBHI declarants affirmatively and sufficiently controverts

SMI's argument that the Assignment Agreements control when determining the date indemnification rights were transferred from LBB to LBHI. LBHI has submitted evidence in the form of declarations of three employees which affirm the intent of LBB and LBHI to assign rights contemporaneously with the prepetition sale of the loans at issue; and such testimony is bolstered by the fact that the Agreements themselves specifically contemplated such assignment, as the Court has discussed in detail herein. *See, e.g., Seo Exp.-Imp. Bank of U.S. v. Agricola del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345, 349 (S.D.N.Y. 2008), *aff'd*, 334 F. App'x 353 (2d Cir. 2009) (recognizing assignment where "the agreement explicitly contemplates the assignation of the debt").

The Court concludes that LBB's intentions and actions with respect to the assignment of rights under the Agreements at the time of the prepetition sale of the loans at issue to LBHI establish a valid assignment under New York law, which does not require a written agreement. *See, e.g., Miller*, 540 F.2d at 557 (internal quotations omitted) ("any act or words are sufficient which show an intention of transferring" rights to the assignee). The Assignment Agreements, which Mr. Trumpp explains were executed after the fact to memorialize the prepetition assignments "for ease of reference in connection with later collection efforts from [S]ellers" (Trumpp Decl. ¶ 24) do not change the Court's conclusion in that regard, particularly since the Court has been presented with no precedent for SMI's suggestion that a later-executed agreement serves to eradicate an earlier assignment. Finally, it bears emphasis that there is no rational commercial explanation for the scenario posited by SMI – that LBHI purportedly purchased loans for full value without retaining an indemnification remedy for breaches of representations and warranties by the originators of such loans, who were gratuitously relieved of liability. The Court finds that LBHI has met its burden to demonstrate by a preponderance of the evidence that

it purchased the at-issue loans prepetition and contemporaneously acquired all rights and
remedies under the Agreements for such loans, including the right to prosecute the RMBS
Indemnification Claims.

## III.   Standing

SMI raises an alternative argument that, even assuming, *arguendo*, that LBB validly
assigned the rights to the RMBS Indemnification Claims to LBHI prepetition, "because LBHI
had transferred any rights to bring the [RMBS Indemnification Claims] to the RMBS Trustees
before the LBHI Petition Date, and [therefore] did not have those rights when it initiated the
RMBS Complaint, LBHI lacks standing."  (Motion at 6.)  LBHI asserts that this argument
ignores the critical distinction because the two different types of loans that it securitized prior to
the Petition Date and the treatment of such loans during the securitization process, an
understanding of which is integral to LBHI's argument that it did not assign away or waive its
indemnification rights under the Agreements with respect to the loans at issue in the RMBS
Complaint.

As such, what follows is a detailed discussion of (i) the facts and allegations set forth in
the RMBS Complaint regarding the securitization process, which the Court accepts as true and,
as discussed *infra*, finds to be sufficiently pled, and (ii) SMI's arguments against LBHI's
standing, each of which, for the reasons set forth *infra*, are without merit.  As SMI bases certain
of its argument on the securitization documents themselves, the Court has reviewed the
documentary evidence and affidavits submitted by the parties, and it finds that the evidence
unambiguously confirms that LBHI has standing to assert the RMBS Indemnification Claims.

### A.   LBHI's Securitization of "Covered Loans" and "Transferor Loans"

When LBHI securitized mortgage loans, it did so in one of two ways, generally depending on the financial strength of the originator.  Investors and the rating agencies require that a creditworthy counterparty make or guaranty a repurchase obligation in the case of a breach, and, as described by Mr. Trumpp in his declaration, LBHI preferred, where possible, not to make its own representations and warranties to the RMBS Trusts acquiring the loan, which would expose LBHI or an affiliate to potential liability if those representations and warranties were breached.  (Trumpp Decl. at ¶¶ 6-7.)

Thus, for larger, more established originators, LBHI assigned or passed through representations and warranties of the originator to the relevant RMBS Trusts without retaining indemnification rights; the loans purchase from these more established originators are referred to by LBHI as "Transferor Loans."  For the Transferor Loans, the securitization process was as follows: LBB entered into "Bank Transfer Agreements" with the Sellers of the Transferor Loans, after which, pursuant to an Assumption and Assignment Agreement ("AAA"), LBB assigned to LBHI the loans and the representations, warranties, and contractual rights related to such loans. Pursuant to a Mortgage Loan Sale and Assignment Agreement ("MLSAA"),[27] LBHI transferred to the depositor, Structured Asset Securities Corporation ("SASC"), the Transferor Loans to be securitized in a particular RMBS Trust, together with an assignment of the contractual rights related to such loans.  SASC then transferred such mortgage loans and all rights it had received under the MLSAA to the relevant RMBS Trust pursuant to a trust agreement ("Trust

---

[27]     Exhibit 2 to the Henderson Declaration is a sample MLSAA, dated February 1, 2006, pursuant to which LBHI transferred to SASC the loans securitized in Lehman XS Trust (Mortgage Pass-Through Certificates, Series 2006-3) ("LXS 2006-3").  As Mr. Trumpp testified, some securitizations were made up entirely of Transferor Loans, others were made up entirely of Covered Loans, and some included both types of loans.  LXS 2006-3 included both Covered Loans and Transferor Loans.  *See* Trumpp Decl. ¶¶ 14, 21.

Agreement") or a Pooling and Servicing Agreement ("PSA").  For the Transferor Loans, generally, the Trust Agreement or the PSA assigned to the RMBS Trust all the loans and appurtenant rights that the depositor had received from LBHI.

In contrast, when LBHI securitized loans purchased from smaller, less-creditworthy originators, including SMI, LBHI had to make its own representations and warranties to the relevant RMBS Trusts, and LBHI retained indemnification rights against the Seller originators in the event LBHI was required to repurchase a mortgage loan from the RMBS Trust due to a breach of a representation or warranty or to otherwise compensate the trust for losses due to a breach of a representation or warranty.  The mortgage loans purchased from these originators are referred by LBHI to as "Covered Loans" or "Bank Originated Loans."  As Mr. Trumpp testified in his declaration, LBHI did not assign its indemnification rights on Covered Loans to the RMBS Trusts because LBHI was the party with direct potential liability to the RMBS Trust, not the originators.  (Trumpp Decl. at ¶ 10.)

For the Covered Loans, the securitization process was as follows: the Covered Loans were purchased from the Sellers by LBB pursuant to LPAs, after which LBB transferred Covered Loans to LBHI on an ongoing basis pursuant to a "Purchase Price and Terms Letter" or a "Master Forward Agreement;" in contrast to the process for Transferor Loans, AAAs were generally not used to assign Covered Loans.  (Id. at ¶¶ 18, 22.)  When LBHI securitized Covered Loans, it transferred the loans themselves to SASC, the depositor, pursuant to an MLSAA, and it did not assign to SASC its rights under the LPAs or Broker Agreements.  (Id. at ¶ 19.)  SASC then transferred the loans to an RMBS Trust pursuant to a Trust Agreement or PSA.  Notably, because SASC as depositor did not receive indemnification rights from LBHI under the MLSAA, any subsequent assignment of SASC's rights to an RMBS Trust pursuant to a PSA or a

Trust Agreement included no indemnification rights.  (Id. at ¶ 20.)  SMI has not disputed that the

loans at issue in the RMBS Complaint are "Covered Loans," as such term is defined herein.

During LBHI's chapter 11 case, the RMBS Trustees filed proofs of claim to recover for

losses in 405 RMBS Trusts, asserting breaches of the representations, warranties, and/or

covenants in the agreements governing the securitizations and asserting $37 billion in repurchase

claims.  The RMBS Trustees initially asserted claims against LBHI related to both Covered

Loans and Transferor Loans.  LBHI objected that it had no liability on the Transferor Loans, as it

had assigned or passed on the originators' representations and warranties directly to the RMBS

Trusts and had only made very limited representations and warranties itself.  *See In re Lehman*

*Bros. Holdings, Inc.*, 566 B.R. 353, 356 (S.D.N.Y. 2017) (explaining distinction between

Transferor Loans and Covered Loans, and upholding expungement of claims based on

Transferor Loans).  In contrast, for the Covered Loans, LBHI acknowledged that it had made

representations and warranties regarding the nature or quality of such loans and the delivery

thereof to the RMBS Trusts.  *Id.*  Thus, the Estimation Proceeding addressed only Covered

Loans and, specifically, the RMBS Trustees' claims for damages of over $11.4 billion based

upon losses flowing from, among other things, the Covered Loans acquired from certain Sellers

and securitized by LBHI.  (*Id.* at 357-58, 366-67; *see also* Bench Decision Regarding Estimation

of RMBS Claims Pursuant to RMBS Settlement Agreement, Case No. 08-13555, Dkt. No.

57791, 161:11 (noting that, in the Estimation Proceeding, "only the Covered Loan Claims are at

issue").)[28]  As discussed, *supra*, on March 15, 2018, this Court entered the Estimation Order,

which resulted in allowed claims for the RMBS Trustees of more than $2.37 billion, and LBHI

---

[28]      LBHI entered into a separate settlement with the RMBS Trustees with respect to the Transferor Loans on
September 5, 2017.  It is the Court's understanding that LBHI not seeking indemnification from the relevant Sellers
related to such settlement.

now seeks to recover on the third-party RMBS Indemnification Claims that it has asserted

against, among other Sellers, SMI, for its incurred losses, liability, and/or judgment to the RMBS

Trustees.

**B.    During the Securitization Process, LBHI Did Not Waive Assign its Rights to Assert the RMBS Indemnification Claims with Respect to the Covered Loans**

SMI asserts that LBHI was "contractually divested of all rights to bring the RMBS

Indemnity [Claims]" pursuant to the AAA, the MSLAA, and the Trust Agreements (collectively,

the "Securitization Agreements") which caused the loans to be pooled and securitized prior to the

Petition Date and "conveyed all 'right title and interest' away from LBB, such that there was

nothing to assign to LBHI in 2008, 2010, 2012, 2013 or 2014." (Motion at 25.)  Alternatively,

SMI contends that if LBHI did acquire indemnification rights from LBB at the time it purchased

the loans at issue, then the Securitization Agreements divested LBHI of all of its indemnification

rights prepetition due to their transfer to the RMBS Trusts.  (Motion at 32.)  Under either

scenario, contends SMI, all indemnification rights with respect to the securitized loans at issue

were conveyed to the RMBS Trusts by the Securitization Agreements, and LBHI lacks standing

to assert the RMBS Indemnification Claims.  By the Motion, SMI cites to sections of the AAA

and the MLSAA which, according to SMI's interpretation, allegedly supports its argument.  (*See*

Motion at 26-30.)

LBHI maintains that SMI ignores the clear distinction between Transferor Loans and

Covered Loans and the different provisions of the Securitization Agreements which implemented

the transfer of each type of loan to the RMBS Trusts.  LBHI emphasizes that (i) the Estimation

Proceeding, the Estimation Order, and all claims at issue in the RMBS Complaint and the other

coordinated adversary proceedings relate only to Covered Loans – those loans for which LBHI

retained indemnification rights and itself made the relevant representations and warranties to the

RMBS Trusts – and (ii) the securitization process and the documentation related thereto differed

as between Covered Loans and Transferor Loans in terms of what was conveyed to the RMBS

Trusts.

In support of its allegations that LBHI does not have standing to pursue the RMBS

Indemnification Claims, SMI first points to a sample AAA from 2005 pursuant to which SMI

alleges LBB conveyed to LBHI all "rights title and interest" in the loans at issue and in the

Agreements (referring to the LPAs and the Broker Agreements).  (Motion at 26-27 (citing to

Henderson Decl., Ex 1 (Sept. 1, 2005 Assumption and Assignment Agreement between LBB and

LBHI)).)  Next, SMI cites to a provision of a sample MSLAA between LBHI and SASC which

purportedly divested LBHI of all "right, title, and interest in and to the foregoing Bank Transfer

Agreements and related Mortgage Loans . . . ." and conveyed them to SASC.  (Motion at 26, 28-

29 (citing to Henderson Decl., Ex. B).)[29]  Finally, SMI refers to a sample Trust Agreement

between SASC and an RMBS Trustee which it argues, simultaneously with the MSLAA,

allegedly conveys "all rights title and interest" in (a) the mortgage loans covered by such

agreement; (b) all payments, any REO property, or proceeds; (c) insurance policies; (d) SASC's

security interest in the collateral; and (e) all right and interests under the MLSAA from SASC to

the RMBS Trust.  (Motion at 29-30 (citing Henderson Decl., Ex. C).)[30]  Based on these

---

[29]     The Motion states that the sample MLSAA to which it refers is annexed to the Henderson Declaration as
Ex. B.  The Henderson Declaration only contains Exhibits 1-4 and does not contain an Exhibit B.  Footnote 33 of the
Motion states that the sample MLSAA to which the Motion cites is the Mortgage Loan Sale and Assignment
Agreement between LBHI and SASC, dated September 1, 2007, for Lehman XS Trust Series 2007-17H.  As
discussed in footnote 27 *supra*, Exhibit 2 to the Henderson Declaration is not in fact the MLSAA referred to in
footnote 33 but instead is a different sample MLSAA, dated February 1, 2006, pursuant to which LBHI transferred
to SASC the loans securitized in Lehman XS Trust (Mortgage Pass-Through Certificates, Series 2006-3).  The
clauses cited in the Motion appears in the sample MSLAA attached as Ex. 2 and, as such, the Court will assume the
Motion intended to refer to such document.
[30]     The Court assumes that the document intended to be cited here is the Trust Agreement annexed to the
Henderson Declaration as Exhibit 3 (not as Exhibit C, as stated in the Motion).  Exhibit 3 to the Henderson
Declaration is the Trust Agreement for Lehman XS Trust, Mortgage Pass Through Certificates, Series 2006-3
between SASC, Aurora Loan Services LLC, and U.S. Bank National Association.

provisions, SMI argues that "[t]he language in each of these three Securitization Agreements

unequivocally evince[s] that LBHI was, at the time of execution of the MSLAA and Trust

Agreements . . . divested of any rights to the claims relating to the mortgage loans and [the]

Agreements." (Motion at 30.)

LBHI asserts that, even if the Motion is treated as a "fact-based" challenge and the Court

considers all of the evidence cited by SMI, SMI's interpretations of the Securitization

Agreements are incorrect and the provisions of such agreements unambiguously do not

contradict the allegations in the RMBS Complaint; rather, they support them. The Court agrees.

First, with respect to the sample AAA, while SMI correctly cites to LBB's assignment to

LBHI of "right, title and interest" in certain "Sale/Servicing Agreements" (Motion at 27-28),

SMI misunderstands the definition of Sale/Servicing Agreements in the document. As LBHI

points out, SMI erroneously states that "Sale/Servicing Agreements" is defined in the AAA "to

mean the Underlying Agreements between LBB and the Moving Defendants," referring to the

LPAs and the Broker Agreements between LBB and Sellers such as SMI. (Motion at 27.) In

fact, as set forth on Exhibit A to the sample AAA, the "Sale/Servicing Agreements" assigned

pursuant to the sample AAA are seven specific "Flow" and "Master" purchase agreements. (*See*

Henderson Decl., Ex. 1 at Ex. A.) These agreements, entered into between LBB and larger

originators of Transferor Loans including GMAC Mortgage Corp., Fifth Third Mortgage

Company, and Impac Funding, are *not*, as SMI asserts, the LPAs or the Broker Agreements

pursuant to which LBHI has brought indemnification claims in the RMBS Complaint and the

other administratively coordinated adversary proceedings. The list of Sale/Servicing

Agreements on Exhibit A to the AAA includes no such LPAs or Broker Agreements.

Moreover, the sample AAA cited by SMI on its face relates only to Transferor Loans. LBHI is not seeking indemnification from any of the counterparties listed in the sample AAA, and SMI has not identified for the Court any Covered Loans (and, in particular, the Covered Loans that are at issue in the RMBS Complaint) transferred by the sample AAA such that its terms would be applicable to this proceeding.  It bears noting that Mr. Trumpp has testified that AAAs generally were used to sell Transferor Loans to LBHI and generally were *not* used to assign Covered Loans (Trumpp Decl. ¶ 22), and SMI has not submitted any evidence to controvert such testimony.[31]  Because the Court has not been presented with any cogent evidence to contradict LBHI's assertion that the sample AAA did not assign contractual rights from LBB to LBHI with respect to the Covered Loans at issue, the Court need not consider the further assignment of rights, if any, pursuant to the subsequent agreement in the securitization process, the MLSAA between LBHI and SASC.  Notwithstanding, as the Court has previously found that LBHI did receive from LBB the contractual rights related to the Covered Loans, the Court will ignore the inapplicability of the AAA here and will proceed to discuss the MLSAA and whether, as SMI argues, LBHI transferred such rights to SASC pursuant to the MLSAA.

SMI's attempts to demonstrate to the Court that the MSLAAs between LBHI and SASC divested LBHI of (i) Covered Loans *and* (ii) all contractual rights related to such loans and conveyed them to SASC fare no better.  SMI is correct that, pursuant to MSLAAs, LBHI sold mortgage loans to SASC, as depositor, in the final step of securitization.  However, SMI incorrectly asserts that, by the MLSAA, LBHI assigned to SASC the "Underlying Agreements"

---

[31]    Mr. Trump also submitted testimony that, in contrast to Transferor Loans which were generally sold to LBHI using AAAs, Covered Loans were generally conveyed from LBB to LBHI pursuant to a separate agreement called a Purchase Price and Terms Letter.  *See* Trumpp Decl. ¶ 22.  In its Opposition, LBHI notes that this Purchase Price and Terms Letter is distinct from the PPTLs between LBB and certain mortgage originators which were used to make so-called "mini-bulk" purchases of groups of loans.  (*See* Opposition at 27 n.29.)

– a term used by SMI to refer to the LPAs and the Broker Agreements – with respect to the

Covered Loans that LBHI transferred to SASC under the MLSAAs. SMI cites to a sample

MLSAA between LBHI and SASC, which states as follows:

> WHEREAS, pursuant to . . . an assignment and assumption agreement (the
> "[AAA]"), dated as of February 1, 2006, between the Bank, as assignor, and the
> Seller, as assignee, the Bank has assigned all of its right, title and interest in and to
> the foregoing Bank Transfer Agreements and related Mortgage Loans . . .
> WHEREAS, the Seller desires to sell, without recourse, all of its rights title and
> interest in and to the Mortgage Loans to the Depositor, assign all rights and interest
> under each Transfer Agreement and each Servicing Agreement . . .

(Motion at 28-29 (citing Henderson Decl., Ex B).[32]) SMI points to this language to assert that

LBHI transferred to SASC all contractual rights in the mortgage loans covered by the MLSAA,

but it conveniently ignores the fact that (i) the mortgage loans and (ii) the contractual rights

associated with such loans (as set forth in the LPAs and the Broker Agreements) were addressed

pursuant to separate provisions of the MLSAA and that selectively quoting from the

"WHEREAS" clauses provides an incomplete and inaccurate picture.

Section 1.01 of the MLSAA provides that, concurrently with the execution and delivery

of the agreement, LBHI transfers, assigns, and otherwise conveys to SASC its "right, title and

interest" in and to "the Mortgage Loans identified on Schedules A and B hereto. . . ."

(Henderson Decl., Ex. 2 (MLSAA) § 1.01(a).) The MLSSA defines "Mortgage Loans" as both

the "Transferred Mortgage Loans," listed on Schedule A, and a separate set of "Bank Originated

Mortgage Loans," listed on Schedule B (*Id.* at 2 (first two recitals)), distinguishing between the

two types of loans being conveyed under the MLSAA.

Separately, pursuant to the MLSAA, LBHI assigned to SASC its rights and interests

under each Transfer Agreement and each Servicing Agreement. (*Id.* § 1.01(a) (providing that

---

[32]    *See* n.29.

LBHI hereby assigns to SASC "all of its rights and interest under each Transfer Agreement and each Servicing Agreement . . . .").)  The MLSSA defines "Transfer Agreements" as five enumerated agreements: (i) two "Flow Servicing Agreements" between LBHI and Lehman affiliates LBB and Lehman Capital, respectively, and (ii) three agreements with originators Option One, HSBC, and SunTrust Mortgage.  (*Id.* at 2 (first recital).)  The Servicing Agreements are defined as four enumerated Servicing or Reconstituted Servicing Agreements.  (*Id.* at 3 (fourth recital).)  Significantly, neither the Transfer Agreements nor the Servicing Agreements are defined in the MLSAA to include the LPAs or the Broker Agreements pursuant to which LBHI asserts the RMBS Indemnification Claims against SMI.  Instead, the MLSAA is clear that LBHI only assigned forward to SASC rights under the enumerated Transfer Agreements and Servicing Agreements which relate to Transferor Loans.

The Court finds that SMI fails to allege facts which contradict the unambiguous provisions of the MLSAA which provide that, with respect to Transferor Loans, LBHI assigned to SASC (i) certain Transferor Loans set forth on Exhibit A to the MLSAA and (ii) all its rights and interest in the enumerated Transfer Agreements and Servicing Agreements but, with respect to Covered Loans, LBHI assigned to SASC only the Covered Loans set forth on Exhibit B to the MLSAA and not any agreements or contractual rights related thereto.[33]

---

[33]    LBHI also points out that "[t]he dichotomy between the Transferor Mortgages and the Bank Originated Mortgages (*i.e.*, the Covered Loans) is carried through into the representations and warranties made by LBHI to the depositor in the MLSAA."  (Opposition at 29.)  Section 1.04(b) of the MLSAA sets out the limited representations and warranties made by LBHI regarding the Transferor Mortgages, which are limited in scope and provide that LBHI has no liability with respect to a breach which is a breach of a representation and warranty made by the originator of the Transferor Loan in the Transfer Agreement. (*See* Henderson Decl., Ex 2 (MLSAA) § 1.04(b).)  LBHI submits that these representations and warranties are intentionally limited in scope because LBHI has passed through to the RMBS Trusts the representation and warranties made by the originators of the Transferor Loans. (Opposition at 29 (citing Henderson Decl. Ex 2 (MLSAA) § 1.01(a)).)  In contrast, in the MLSAA, LBHI itself made direct and extensive representations and warranties regarding the Covered Loans, which mirror the representations and warranties made in the Agreements by SMI and other Sellers of Covered Loans, including that "[t]he documents, instruments and agreements submitted for loan underwriter were not falsified and contain no untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the information and statements therein not misleading," and that "[t]o the best of [LBHI]'s knowledge, no fraud was

As discussed *supra*, during the final step in the securitization process, SASC transferred mortgage loans to the relevant RMBS Trust pursuant to a Trust Agreement or a PSA, which agreement generally assigned to the trust all the loans and appurtenant rights that the depositor had received from LBHI.  By the Motion, SMI asserts that the Trust Agreement transferred all rights and interests of SASC to the RMBS Trust, which, under SMI's reading of the agreements, included indemnification rights that were transferred to SASC under the MLSAA.  (*See* Motion at 30 (citing to Henderson Decl., Ex. 3 (Trust Agreement) § 2.01).)

The Court has already concluded, *supra*, that, while the MLSAA expressly contemplates LBHI's assignment of certain contractual rights to SASC related to Transfer Agreements and Servicing Agreements, such assignment did not include the indemnification rights under the LPAs or Broker Agreements pursuant which LBHI seeks indemnification from SMI. Accordingly, the Court need not analyze provisions of the sample Trust Agreement cited to by SMI.  It bears noting, however, that Section 2.01 of the sample Trust Agreement contains similar language to the MLSAA which reinforces the limited scope of the assignment of rights and ties such assignment to the Servicing Agreements and Transfer Agreements enumerated in the MLSAA.  (*See* Henderson Decl., Ex. 3 (Trust Agreement) § 2.01 (providing that "the Depositor does hereby assign to the Trustee all of its rights under the [MLSAA], including all rights of the Seller under each related Servicing Agreement and each related Transfer Agreement . . . .").)  As in the MLSAA, the sample Trust Agreement does not reflect any assignment of rights in any LPAs of Broker Agreements, which rights the Court has concluded were never assigned to SASC by the MLSAA.

---

committed in connection with the origination of the Bank Originated Mortgage Loan. . . ."  (*Id.* § 1.04(c)(v); *see, e.g., id.* § 1.04(c)(xviii) (appraisal representation and warranty).)

In addition, the Court observes that SMI's arguments regarding the Securitization
Agreements and the alleged transfer of indemnification rights as to the Covered Loans
thereunder directly conflict with the point of the Estimation Proceeding.  The Estimation Order
granted the RMBS Trustees an allowed claim of $2.37 billion against LBHI on account of
breaches of loan-level representations and warranties that LBHI made during the securitization
process regarding the Covered Loans.  It is difficult to conceive of a scenario in which LBHI
would have agreed to make such loan-level representations and warranties to the RMBS Trusts
and retain sole direct liability for breach but simultaneously would have retained no right to
recover in turn from the Sellers that originated such loans.  In the scenario posited by SMI, the
RMBS Trusts would have received their allowed claim of $2.37 billion against LBHI and would
also have a right to pursue the Sellers for breach because LBHI allegedly assigned its
indemnification rights to the RMBS Trusts.  SMI has not offered any commercial explanation for
this argument, which defies logic.

The Court finds that LBHI has met its burden to demonstrate by a preponderance of the
evidence that it has standing to assert the RMBS Indemnification Claims, as it did not waive or
assign its indemnification rights with respect to the Covered Loans during the securitization
process.  The interpretations of the Securitization Agreements advanced by SMI fail to contradict
LBHI's allegations and are inconsistent with the documents themselves.

## IV.    Subject Matter Jurisdiction and the GSE Subject Matter Jurisdiction Decision

In the GSE Subject Matter Jurisdiction Decision, the Court analyzed (i) applicable law
regarding subject matter jurisdiction and (ii) the relevant provisions of the LBHI Plan which
preserved LBHI's right to assert Litigation Claims (as such term is defined in the Plan) for
reimbursement and indemnification on account of distributions made to holders of allowed

claims.  The Court evaluated whether it had "related to" jurisdiction over the GSE

Indemnification Claims and, after an extensive analysis, concluded that the GSE Indemnification

Claims "have a close nexus to the Plan in that the Plan provides for the retention of jurisdiction

over such claims and that the prosecution of [such claims] by the Plan Administrator affects the

implementation and administration of the Plan . . . ."  (GSE Subject Matter Jurisdiction Decision,

2018 Bankr. LEXIS 2406, at *14.)

        The Court found that the GSE Indemnification Claims arose, contingently, prepetition at

the time the Seller defendants in the GSE Actions sold LBB the allegedly defective loans

pursuant to the Agreements.  As such, the GSE Indemnification Claims existed as contingent and

unmatured contractual indemnification claims until the right to indemnification was fixed.  As

the Court stated, "LBHI held such claims at the time of the Debtors' bankruptcy filing before the

claims were ripe for litigation, and the Plan preserved such claims and re-vested them in the Plan

Administrator for liquidation once such claims matured and, ultimately, distribution, if litigation

of such claims was successful."  (*See Id.* at *23 (citing Confirmation Order ¶ 79; Plan §§ 1.17,

6.1(b), 8.14(b), 13.8).).  The Court reasoned that (i) entry of the GSE Settlement Orders caused

such indemnification claims to ripen into litigable claims; (ii) the Plan provides for the

bankruptcy court's retention of jurisdiction over such claims; and (iii) the prosecution of the GSE

Actions affects the implementation and administration of the Plan because any recoveries from

such proceedings will be paid to creditors.  These facts, the Court found, "create a close nexus

between the Indemnification Claims and the Plan that easily meets the standard for 'related to'

jurisdiction pursuant to 28 U.S.C. § 1334(b) and applicable law in this District."  (*Id.* at *25-26

(citations omitted).)

Here, this Court has concluded that LBHI has sufficiently alleged that (i) LBHI obtained

from LBB prepetition the right to assert the RMBS Indemnification Claims against SMI and (ii)

when the loans at issue in the RMBS Complaint were securitized, LBHI retained the rights to

pursue the RMBS Indemnification Claims and did not convey such rights to the RMBS Trusts.

Considering the Motion as a facial challenge pursuant to Rule 12(b)(1), the Court finds that

LBHI has articulated well-pleaded allegations that this Court has subject matter jurisdiction over

the RMBS Indemnification Claims asserted in the RMBS Complaint, and the Court takes such

allegations as true when considering the Motion.  SMI has alleged no facts which plausibly

contradict the allegations in the RMBS Complaint.  The Court also concludes that the RMBS

Complaint survives a "fact-based" challenge under Rule 12(b)(1), as SMI has not proffered

evidence which materially controverts the allegations in the RMBS Complaint, and LBHI has

introduced affirmative documentary and testimonial evidence demonstrating that this Court has

jurisdiction over the RMBS Indemnification Claims and the RMBS Complaint.  Finally, LBHI

has demonstrated by a preponderance of the evidence that it has standing to pursue the RMBS

Indemnification Claims, which claims it acquired prepetition and retained during the

securitization process.

SMI and LBHI have each, respectively, incorporated by reference in their pleadings the

pleadings they filed in connection with the GSE Subject Matter Jurisdiction Decision,

notwithstanding SMI's argument that such decision is inapplicable here because it asserts that

LBHI did not hold, prepetition, the RMBS Indemnification Claims.  Simply put, this argument is

meritless.  The Court finds that, for the reasons set forth *supra*, the facts underlying this decision

are nearly identical to those before the Court in the GSE Subject Matter Jurisdiction Decision.

Accordingly, the Court incorporates by reference herein the GSE Subject Matter Jurisdiction

Decision including, *inter alia*, the Court's analysis of the Plan, the Confirmation Order, and applicable law as set forth in the GSE Subject Matter Jurisdiction Decision. (See GSE Subject Matter Jurisdiction Decision, 2018 Bankr. LEXIS 2406, at *8-27.)

Here, the Court finds that the RMBS Indemnification Claims have a close nexus to the Plan in that the Plan provides for the retention of jurisdiction over such claims, and the prosecution of such claims by the Plan Administrator affects the implementation and administration of the Plan. Like the GSE Indemnification Claims, LBHI has sufficiently pled that the RMBS Indemnification Claims arose, contingently, prepetition at the time SMI and the other Sellers of the Covered Loans sold LBB the allegedly defective loans pursuant to the Agreements. As such, the RMBS Indemnification Claims existed as contingent and unmatured contractual indemnification claims until the right to indemnification was fixed. As the Court found in its prior decision, "[t]he Plan preserved such claims and re-vested them in the Plan Administrator for liquidation once such claims matured and, ultimately, distribution, if litigation of such claims was successful." (*See Id.* at *23 (citing Confirmation Order ¶ 79; Plan §§ 1.17, 6.1(b), 8.14(b), 13.8).) So too here. In the instant case, entry of the Estimation Order caused the RMBS Indemnification Claims to ripen into litigable claims. The Plan provides for the bankruptcy court's retention of jurisdiction over such claims, and the prosecution of the RMBS Complaint affects the implementation and administration of the Plan because any recoveries from such proceeding will be paid to creditors of LBHI. As in the GSE Subject Matter Jurisdiction Decision, the Court holds that the foregoing facts create a close nexus between the RMBS Indemnification Claims and the Plan that easily meets the standard for 'related to' jurisdiction pursuant to 28 U.S.C. § 1334(b) and applicable law in this District.[34]

---

[34]    *See Id.* at *25-26 (citing *In re Refco, Inc. Sec. Litig.* 628 F. Supp. 2d at 443 (finding that action shared a close nexus with bankruptcy proceeding and implementation and execution of confirmed plan were directly at issue

## CONCLUSION

For all of the foregoing reasons, the Court finds that it has subjection matter jurisdiction over the RMBS Complaint and the RMBS Indemnification Claims asserted therein, and LBHI has standing to pursue such claims.  The Motion is denied.

IT IS SO ORDERED.

Dated: August 16, 2022
New York, New York

/s/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE

---

because claims being prosecuted arose under plan and any recoveries would be distributed to creditors); *ResCap Liquidating Trust v. Primary Cap. Adv.*, 527 B.R. at 871 (holding that indemnification claims preserved and transferred for prosecution under Plan meet the close nexus standard); *Neilson v. Straight-Out Promotions, LLC (In re Tyson)*, 2007 Bankr. LEXIS 2832 at *8-9 (Bankr. S.D.N.Y. Aug. 17, 2007) (finding close nexus test met because any proceeds recovered in adversary proceeding would be paid to creditors, the chapter 11 proceedings had not yet been fully administered, and the plan provided for the court's retention of jurisdiction "to hear and resolve any causes of action involving the Debtors, the Reorganized Debtor, or the Estates that arose prior to the Effective Date or in connection with the implementation of the Plan.")).